STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  Docket No. CV-06-207

                                                  TDW-CUM- 11/5/07

LAWRENCE D. GREEN, et al.,

     Plaintiffs,

v.                                                ORDER

SUBURBAN MORTGAGE ASSOCIATES
INC., et al.,                                     DONALD L. GARBRECHT
                                                  LAW LIBRARY

     Defendants.                        FEB 06 2008

Before the court are motions by both defendants, Suburban Mortgage Associates Inc. and Sandy River Health Systems LLC, for summary judgment.

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. E.g., Johnson v. McNeil, 2002 ME 99, ¶ 8, 800 A.2d 702, 704. The facts must be considered in the light most favorable to the non-moving party. Id. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. Rodrigue v. Rodrigue, 1997 ME 99 ¶ 8, 694 A.2d 924, 926.

In this case there is one preliminary matter before the summary judgment motions can be considered. In addition to opposing both motions, plaintiffs Lawrence Green, Jed Prouty Investment Co. Inc., Jed Prouty Health Care Inc., and Jed Prouty

Healthcare Management Inc.[1] also filed motions seeking to stay the motions for summary judgment to allow further discovery to be taken pursuant to Rule 56(f). Ordinarily, a party filing a Rule 56(f) motion is not seeking for the summary judgment decision to be stayed but is rather seeking a continuance of its deadline to respond to the motion until certain discovery can be completed. In this instance, the court did not act on plaintiffs' Rule 56(f) motion but it also never issued any stay of discovery. There was no reason why plaintiffs could not have proceeded to take any discovery they wanted but they apparently did not do so.

Thereafter and more importantly, the parties jointly filed a motion for an extension of the discovery deadline stating that Suburban had filed a motion for summary judgment, that Sandy River Healthcare expected to file a similar motion in the near future, and that the parties sought to defer any further discovery until the court ruled on the summary judgment motion. Plaintiffs' counsel was one of the attorneys who signed that motion.

On February 6, 2007 the court endorsed that motion with the notation that it did not ordinarily stay discovery while a summary judgment motion was pending but noted that plaintiff had consented to such a stay in this case. It ordered that a discovery conference be scheduled. On February 9, 2007, after the conference, the court agreed to stay the existing discovery deadlines. *See* Hearing Conference Record of February 9, 2007.

Once a party has joined in a motion to forego discovery until after a summary judgment is decided, it cannot legitimately argue that it needs discovery in order to

---

[1] Green is the chief executive of each of the three corporate plaintiffs and he and members of his family own all the stock in those companies. Complaint ¶¶ 2-4.

2

respond to the summary judgment motion. Accordingly, the court denies plaintiffs' Rule 56(f) motions[2] and proceeds to the merits of the summary judgment motions.[3]

Suburban Motion – Undisputed Facts

While the parties have offered lengthy recitations of the facts, the facts asserted by Suburban in its statement of material facts (Suburban SMF) have for the most part been admitted by Green and Suburban has admitted – for purposes of summary judgment only – all of the assertions in plaintiffs' statement of additional material facts.[4] From the statements of material facts, the court has distilled the following facts which are relevant to Suburban's motion. These facts are either undisputed or the court has accepted the version of events offered by plaintiffs as the party opposing summary judgment.

This action arises out of the conversion of the Jed Prouty Tavern and Inn in Bucksport, which was owned by Green through certain of his corporate entities, into an assisted living facility. Defendant Sandy River provides health care services to the

---

[2] Although plaintiffs had effectively consented to a stay of discovery on February 9, 2007, they thereafter filed a second Rule 56(f) motion to stay decision on Sandy River's subsequently filed summary judgment motion. Plaintiffs cannot have it two ways. Having consented to a stay of discovery until the motions were decided, they cannot argue that the motions cannot be decided without discovery.

[3] In the alternative, the court agrees with defendants that plaintiffs' Rule 56(f) motion fails to adequately specify the substance of the testimony they would seek in discovery and how that testimony would affect the outcome of the summary judgment motion. *See Bay View Bank N.A. v. Highland Golf Mortgage Realty Trust*, 2002 ME 178 ¶ 22, 814 A.2d 449, 454-55. Nor have plaintiffs demonstrated that there was good cause for their failure to obtain the discovery sought during the period prior to the filing of Suburban's motion and during the period after Suburban filed its motion when discovery was not stayed. *See id.* Plaintiffs' consent to a stay of discovery until the summary judgment motions has been decided is inconsistent with any argument that plaintiffs have been diligently seeking the discovery necessary to oppose the motions.

[4] Plaintiffs filed separate statements of additional material facts in connection with Suburban's motion for summary judgment and Sandy River's motion for summary judgment. These will hereafter be designated as "Plaintiffs' SAMF as to Suburban" and "Plaintiffs' SAMF as to Sandy River" respectively.

elderly at various facilities throughout Maine. It entered into a development agreement with Green to assist him in the conversion and later into a consulting agreement to assist Jed Prouty Healthcare Management Inc. in the operation of the facility. Defendant Suburban provided financing for the conversion and is alleged to have provided financial advice upon which Green relied in deciding to undertake the conversion. The assisted living facility was not successful and ceased operation in March 2004.

Plaintiffs' claims against Suburban arise out of contractual dealings with Suburban from which two specific agreements arose – a Loan Commitment Agreement executed in December 1996 and a Construction Loan that closed on September 28, 1998. *See* Suburban SMF ¶¶ 15, 27 (admitted). At his deposition, Green testified that plaintiffs' claims against Suburban were the following: (1) that Suburban erroneously assured Green that the Jed Prouty Inn could be profitably converted and operated as an assisted living facility[5] and (2) that Suburban induced Green to invest an additional $75,836 into the project for change orders based on erroneous assurances that those funds could be recouped from HUD. *See* Green Dep. 116-16, 117-18.

It is undisputed that the alleged assurances by Suburban and Sandy River relating to the projected ability of the assisted living facility to operate profitably occurred prior to the closing of the construction loan in September 1998. Plaintiffs' SAMF as to Suburban ¶¶ 63, 81. Those assurances necessarily predated the opening of the facility in June 1999. It is also undisputed that the alleged representations or

---

[5] Suburban argues that its contractual obligations to Green under the Loan Commitment Agreement did not include providing any advice or analysis as to whether the facility could be profitably operated. Green argues that the Loan Commitment Agreement did not set forth the entire arrangement between the parties and that Suburban undertook the role of advising Green on whether that the facility would be profitable. The court does not need to resolve this dispute to decide Suburban's motion.

4

assurances made by Suburban and Sandy River with respect to the $75,836 in disallowed change orders occurred prior to March 1999. Suburban SMF ¶ 33 (admitted). The complaint in this action was filed on April 5, 2006. Suburban therefore contends that the claims against it are barred by the six-year statute of limitations contained in 14 M.R.S. § 752.

In response, plaintiffs argue that a discovery rule should be applied in this case because a fiduciary relationship existed between Green and Suburban. On this issue the undisputed facts are that Green had no relationship with Suburban prior to 1996, when he was introduced to David Eaton of Suburban by Sandy River. Plaintiffs' SAMF as to Suburban ¶ 57. Green is a college graduate who at the time of his dealings with Suburban and Sandy River had been president of the Jed Prouty Investment Co. Inc., an entity that invests in stocks, bonds, and real estate, since 1981. Personally or through corporations he controlled, Green had owned a motel called the Best Western Jed Prouty Motor Inn in Bucksport since 1981 and had owned another motor inn in Millinocket and a residential apartment building in Bucksport since 1983. Suburban SMF ¶¶ 39-45. In 1988 or 1989 Green, through his corporation Jed Prouty Investment Co. Inc., had acquired the Jed Prouty Tavern and Inn – the property later converted to an assisted living facility – and operated it as a restaurant and motel until the conversion. Suburban SAMF ¶¶ 2-5 (admitted).[6]

In 1996 Green understood how financing, financial projections, and debt service worked and he was familiar with property appraisals, although he had not previously been involved with assisted living facilities. Suburban SMF ¶¶ 9, 21; Plaintiffs' Response to Suburban SMF ¶¶ 9, 21. As of 1996 Green had financed the acquisition of

---

[6] During a twelve-month period in 1992-93, the Jed Prouty Inn and Tavern was closed to allow renovations. After the renovations were completed, Green leased the restaurant portion of the Inn to a third party but continued to be responsible for the renting of rooms at the inn. *Id.*

commercial properties or had refinanced such properties on ten occasions. Suburban SMF ¶¶ 2-3, 42-43, 45 (admitted).

During the 1996-97 time period, Green obtained those additional studies from entities retained at the suggestion of Suburban or Sandy River relating to the proposed conversion: a market penetration analysis from Atlantic Retirement Communities, a building evaluation and space needs study from an architectural firm, and an additional market study from Planning Insight Inc. Suburban SMF ¶¶ 12-14; Plaintiffs' Response to Suburban SMF ¶¶ 12-14. Green also was provided with an appraisal, commissioned by Suburban, of the value of the property once converted. Suburban SMF ¶ 20; Plaintiffs' SAMF as to Suburban ¶ 75. In connection with HUD financing issues, Green was represented by the Curtis Thaxter law firm, which was recommended by Suburban. Suburban SMF ¶ 28, Plaintiffs' SAMF as to Suburban ¶ 76.

Green acknowledges that at all relevant times during the process leading up to and through the conversion he was not emotionally or physically impaired in any way. Suburban SMF ¶¶ 51-53 (admitted). He asserts, however, that he had no experience with assisted living facilities or FHA-insured financing and that, although he had owned and managed several motels, his experience in the hospitality industry was not applicable to the assisted living industry. According to Green, the market forces in those industries are very different. Plaintiffs' SAMF as to Suburban ¶¶ 59-60, 62. Accordingly, Green asserts, he relied on Sandy River and/or Suburban to give him the necessary guidance and he made clear to them that he was relying on them in this manner. Plaintiffs' SAMF as to Suburban ¶¶ 63, 64, 66, 81.

It is undisputed that at least by late summer or early fall of 2001, after the assisted living facility had been open for approximately two years, it became apparent to Green that the assisted living facility was not operating profitably, that the cash flow

shortages would not abate, that revenues would not reach projected levels in the future, and that the facility was not going to be able to continue operating. Plaintiffs' SAMF as to Suburban ¶¶ 88-90.

Contract and Fiduciary Duty Claims Against Suburban

Plaintiffs have asserted two causes of action against Suburban – for breach of contract and for breach of fiduciary duty. Measured from the date of Suburban's alleged wrongdoing, plaintiffs' contract claims are barred by the six-year statute of limitations. Since all of Suburban's alleged wrongdoing occurred prior to March 1999,[7] Green had to sue Suburban prior to March 2005. 14 M.R.S. § 752. This action, however, was commenced more than a year later, in April 2006.

Plaintiffs' counterargument is essentially two-fold. They first contend that their causes of action did not accrue until mid 2001 when it became apparent that market conditions would not support the financial projections for the assisted living facility. This argument is unavailing in the face of Law Court decisions holding that a cause of action for breach of contract accrues at the time the contractual obligations are allegedly breached – even if the harm resulting from the breach is not discovered until a later date. E.g., *Dunelawn Owners Assoc. v. Gendreau*, 2000 ME 94 ¶¶ 11-14, 750 A.2d 591, 595-96; *Kasu Corp. v. Blake Hall & Sprague Inc.*, 582 A.2d 978, 980 (Me. 1990); *Chiapetta v. Clark Associates*, 521 A.2d 697, 699 (Me. 1987).[8]

---

[7] As noted above, the allegedly erroneous projections as to the profitability of the facility were provided to Green prior to the closing of the construction loan in September 1998. The alleged misrepresentations made with respect to the disallowed change orders were made prior to March 1999.

[8] While this rule may work a substantial hardship on a plaintiff which does not even discover that it has been injured until after the statute of limitations has run, that situation is not presented in this case. Plaintiffs acknowledge here that they became aware that the financial projections were erroneous in mid 2001 and that they learned HUD was not going to approve

7

Plaintiffs argue, however, that a "discovery rule" should apply in this case because a fiduciary relationship allegedly existed between Green and Suburban. They also argue that their tort claim for breach of fiduciary duty was timely under the principle that tort claims, unlike contract claims, do not accrue until a plaintiff is injured by the allegedly tortious conduct. *See Dunelawn*, 2000 ME 94 ¶ 11, 750 A.2d at 595; *Chiapetta*, 521 A.2d at 699. In this case plaintiffs argue that they were not injured (and their tort claim therefore did not accrue) until 2001 – when the assisted living facility's financial projections were found to be unrealistic. This argument, however, incorrectly equates the issue of when plaintiffs discovered they were injured with the issue of when they were injured. Regardless of when the alleged injury was discovered, the alleged injury in this case occurred when plaintiffs undertook to convert the inn into an assisted living facility and assumed various liabilities based on allegedly erroneous financial projections.

Nevertheless, a discovery rule, as opposed to a time of injury rule, has been applied in at least some cases when a confidential fiduciary relationship existed between the plaintiff and the defendant. *See Nevin v. Union Trust Co.*, 1999 ME 47 ¶ 30, 726 A.2d 694, 700. As a result, plaintiffs' argument in support of a discovery rule (as well as their cause of action for breach of fiduciary duty on the merits) depends on their allegation that a fiduciary relationship existed in this case. If, as Suburban argues, there is no disputed issue of fact for trial with respect to the existence of a fiduciary relationship, then both plaintiffs' breach of fiduciary duty claim and their reliance on the discovery rule are unavailing.

---

the change orders in August 2000. Plaintiffs' SAMF as to Suburban ¶¶ 58, 86. Plaintiffs did not begin dealing with Sandy River and Suburban until sometime in 1996. Green Aff. ¶ 3. At a minimum, therefore, all of the claims asserted in the complaint would have been timely if plaintiffs had commended a lawsuit before the end of 2001.

For a fiduciary relationship to exist, there must be the actual placing of trust or confidence by one party and a great disparity of position and influence between the parties. *See Stewart v. Machias Savings Bank*, 2000 ME 207 ¶ 10, 762 A.2d 44, 46. To demonstrate the necessary disparity of position and influence, a party must demonstrate either diminished emotional or physical capacity or the letting down of all guards and defenses. *Id.* 2000 ME 207 ¶¶ 11-12, 762 A.2d at 46-47. Moreover, to establish the breach of a fiduciary relationship there must be some abuse of the trust and confidence placed in the fiduciary. *E.g., Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975). Significantly, most if not all cases involving breach of fiduciary duty involve situations where the alleged fiduciary had a hidden agenda. *See, e.g., Morris v. Resolution Trust Corp.*, 622 A.2d 708, 711-13 (Me. 1993).

In this case Suburban has offered evidence that there was not a great disparity of position and influence between the parties, that Green was not in a vulnerable position because of diminished capacity or otherwise, and that Green had not let down all guards and defenses. The opposing evidence offered by Green does not create a disputed issue for trial on these issues, nor on this record is there a disputed issue for trial as to whether the necessary abuse of trust and confidence has occurred. In the *Morris* case, heavily relied upon by plaintiffs, the party bringing a fiduciary claim had relied on a bank officer for a reference as to the competence and integrity of the contractor. She had also relied upon the bank officer to monitor the status of the renovation project. The bank officer knowingly deceived the plaintiff both as to the competence and integrity of the contractor and as to whether the work was being diligently performed. He did this in order to obtain payments for the contractor, who was delinquent on several loans to the bank. *See* 622 A.2d at 710-11.

In this case, in contrast, there is no allegation of knowing deception on Suburban's part. Nor did Green ever cede control of decision making to Suburban[9]. The facts in this case negate a finding that a fiduciary relationship existed under the test set forth in *Stewart*. *See* 2000 ME 207 ¶ 12, 762 A.2d at 46-47.[10]

Green's position is that because he was inexperienced with respect to assisted living facilities and because he relied on the expertise of Suburban with respect to the transactions at issue, there was a disparity of expertise that created a fiduciary relationship.[11] This argument, if accepted, would create a fiduciary relationship whenever a consultant is hired to offer expertise on a subject as to which the party employing the consultant possesses no expertise. Indeed, under Green's theory, if a homeowner hired an electrician to do electrical work as to which the homeowner possessed no competence, the electrician would thereby become a fiduciary. On this record, Green's fiduciary relationship claim as to Suburban does not present a disputed issue for trial.

In the alternative, even if there were a factual dispute as to the existence of a fiduciary relationship in this case, it is not clear that a discovery rule should be applied.

---

[9] Suburban SMF ¶ 56.

[10] The relative level of sophistication of the plaintiff in the *Stewart* case appears to have been less than that of Green in the case at bar. Green is an experienced businessman who had been president of an investment company since 1981 and had acquired two motels, a residential apartment building, and the inn which was converted into an assisted living facility. Stewart was a first-time homebuyer. Nevertheless, in *Stewart* the Law Court overturned a jury verdict because it concluded that "no reasonable view of the evidence supports the conclusion that there was a great disparity of position and influence between Stewart and the Bank." *Id.*

[11] Green also argues that Suburban had a conflict of interest because it would not be compensated unless HUD approved a mortgage and such a mortgage closed. Arguably, this gave Suburban an incentive to offer overly optimistic financial projections as alleged by Green. The problem with this argument, however, is that this conflict, if it existed, would have been fully apparent to Green; he was aware of the conditions under which Suburban was to be compensated and was free to evaluate Suburban's projections in that light. *See* Green Aff. ¶ 17. This does not constitute the kind of undisclosed conflict of interest or hidden agenda such as existed in the *Morris* case, where the plaintiff was never made aware that the bank had an undisclosed interest in getting the contractor paid in order to recover its defaulted loans.

First, as noted above, the alleged injury here was concededly discovered within the six-year statute of limitations. While the discovery rule has been used to extend the period of limitations on an undiscovered claim that would otherwise be time-barred, the court is not aware of any instance in which the discovery rule has been applied to allow a plaintiff who is aware of a claim that is not yet time barred to disregard the existing statute of limitations.

Moreover, the Law Court has observed that even where a fiduciary relationship exists, the discovery rule is only appropriate when the plaintiff

> must rely on the defendant's advice as a fiduciary, and the cause of action was virtually undiscoverable absent an independent investigation that would be destructive of the fiduciary relationship.

*Nevin v. Union Trust Co.*, 1999 ME 47 ¶ 25, 726 A.2d at 699, *citing Anderson v. Neal*, 428 A.2d 1189, 1192 (Me. 1981).

In this case, the summary judgment record discloses no reason why the relationship between Green and Suburban would have made it difficult for Green to have made an independent investigation or to have retained an independent consultant to evaluate the financial prospects of assisted living facility, if he had chosen to do so.[12] In contrast with an attorney-client or a trustee-beneficiary relationship, which could potentially be ruptured by an independent investigation, there is nothing to suggest that the nature of business relationship between Green and Suburban in this case would have hindered or prevented Green from independently investigating the profitability of an assisted living project or otherwise seeking a "second opinion."

Suburban's motion for summary judgment will be granted.

---

[12] In this connection, Green did obtain two-market analyses and an appraisal of the projected value of the facility. Although Green notes that these studies were commissioned or their authors recommended by Sandy River or Suburban, he has offered no evidence that the information provided was altered or distorted at the behest of Sandy River or Suburban.

11

## Sandy River Motion – Undisputed Facts

Like plaintiffs' claims against Suburban, plaintiffs' claims against Sandy River are based on alleged representations as to the financial viability of the conversion to an assisted living facility and on alleged representations that the $76,836 in change orders could be recouped. According to plaintiffs, these representations were made by Sandy River in connection with a development agreement that was entered into between Green and Sandy River in February 1997. Plaintiffs also allege that Sandy River failed to perform its contractual obligations under a subsequent consulting agreement that was in effect from approximately July 2000 to July 2001.

With respect to the claims arising out of Sandy River's role in providing erroneous financial projections, Green alleges that, like Suburban, Sandy River provided him with various financial projections and information upon which he relied in making the decision to undertake the conversion and obtain a construction loan before the facility opened in June 1999. Because this was more than six years prior to April 5, 2006, when this action was commenced, Green relies upon the discovery rule and the existence of an alleged fiduciary relationship to avoid the statute of limitations bar.

Because Green's breach of contract and fiduciary duty claims against Sandy River based on unfounded financial projections mirror his claims against Suburban, no extended reiteration of the relevant facts as to those claims is necessary. As in the case of Suburban, Green's fiduciary duty claim against Sandy River is based on his

12

inexperience with the assisted living industry and his reliance upon the expertise of Sandy River as his consultant.[13]

As noted above, Green's claims against Sandy River include an additional contract claim based on certain consulting services that Sandy River provided after the opening of the facility. Sandy River's arrangement to provide those services was eventually formalized in a consulting agreement between Sandy River and Jed Prouty Healthcare Management Inc. that was entered into in July 2000. Plaintiffs' SAMF as to Sandy River ¶¶ 93, 96. Pursuant to this consulting agreement, a Sandy River employee was installed as the facility administrator. *Id.* ¶ 98. During this period Sandy River made a number of recommendations that Green was unable to adopt because the facility was cash-strapped and there were no available funds. *Id.* ¶ 102.

Sandy River notified Green on March 31, 2001 that it was terminating the Consulting Agreement effective June 30, 2001. *Id.* ¶ 104; *see* Sandy River SMF ¶ 57. However, Green contends that Sandy River did not provide any meaningful services under the Consulting Agreement for the period from March 2001 through June 2001. Plaintiffs' SMF as to Sandy River ¶¶ 105-06. Green also faults Sandy River for not advising him to cut his losses and shut the facility down. *Id.* 117.

Contractual and Fiduciary Duty Claims against Sandy River Based on Financial Projections

Excluding plaintiffs' claims with respect to the consulting agreement, analysis of Sandy River's summary judgment motion tracks the previous discussion with respect to

---

[13] Sandy River argues that much of the evidence offered in opposition to its motion for summary judgment is derived from an affidavit of Lawrence Green that Sandy River contends does not contain admissible evidence for purposes of summary judgment. *See* M.R.Civ.P. 56(e). In the court's view, any ambiguity in the jurat as to Green's personal knowledge is dispelled by ¶ 1 of the affidavit, and most but not all of Sandy River's other criticisms of the affidavit are unfounded.

13

Suburban's motion. As with their claims against Suburban, plaintiffs' breach of contract claims arising out of any representations or information provided prior to the decision to convert the facility and the opening of the facility are subject to the six-year statute of limitations unless (1) a fiduciary relationship existed and (2) a discovery rule is applicable. As with Suburban, however, the summary judgment record with respect to Sandy River demonstrates that there is no disputed issue for trial as to the existence of a fiduciary relationship. Accepting for purposes of this motion that Green relied on Sandy River's expertise, such reliance, without more, does not preclude summary judgment on this issue. *See Stewart*, 2000 ME 207 ¶ 12, 762 A.2d at 46-47.

Thus, Green has not offered evidence that he was in a vulnerable position as to Sandy River because of diminished capacity, because of some unusual aspect of his relationship with Sandy River, or for any other reason. Nor has he offered evidence of a great disparity in position and influence or that he had let down all guards and defenses. In addition, he has not offered evidence of any knowing deception on Sandy River's part, nor has he offered evidence that on the issue of whether to proceed with the conversion, he ceded his decision-making responsibility to Sandy River.[14]

For the same reasons discussed with respect to Suburban, therefore, Sandy River is entitled to summary judgment on the issue of whether any fiduciary relationship existed between Green and Sandy River and on whether a discovery rule should be applied to Counts II and IV of the complaint.

---

[14] Sandy River SMF ¶ 52. Plaintiffs qualified their response to ¶ 52 of Sandy River's SMF by noting that once the assisted living facility opened, its day-to-day operations were under the control of a licensed administrator. *See* Plaintiffs' Response to ¶¶ 26, 52 of Sandy River SMF. However, plaintiffs have not offered any evidence that Green himself did not make the decision to go forward with the conversion to an assisted living facility.

14

## Claims Against Sandy River Based on Violations of Consulting Agreement

Count V of the plaintiffs' complaint is based on Sandy River's alleged breach of its obligations under its consulting agreement, which was in effect from July 2000 through June 2001. Since the complaint was filed in April 2006, these contractual claims are not barred by the statute of limitations.

Sandy River notes that plaintiffs have acknowledged that Sandy River made various recommendations during the consulting agreement and that plaintiffs were unable to implement those recommendations due to lack of funds. *See* Plaintiffs' SAMF as to Sandy River ¶ 102. If these were the sole facts in the record, the court would agree that Sandy River would be entitled to summary judgment on the consulting agreement claims. However, plaintiffs have offered evidence that after the departure of Jeff Ackor as facility administrator in February 2001, Sandy River did not provide any meaningful services to Jed Prouty Healthcare Management Inc. under the consulting agreement. Plaintiffs' SMF as to Sandy River ¶¶ 105-06.

Although it is evident from plaintiffs' submissions that their main focus is on the claim that the financial projections underlying the assisted living project were unsound, their complaint (¶¶ 54-56) squarely alleges that Sandy River failed to live up to the July 2000 consulting agreement, failed to assist plaintiffs in keeping the facility in compliance with applicable regulations, failed to assist plaintiffs in hiring staff, and failed to assist plaintiffs in filling the facility. At least with respect to the period after Ackor's departure, Sandy River's summary judgment motion fails to demonstrate there are no disputed facts on this issue and that Sandy River is entitled to judgment as a matter of law on this claim.

Remaining to be considered is plaintiffs' claim that Sandy River also breached its contractual obligation under the 2000-01 consulting agreement by failing to recommend

that plaintiffs cut their losses and close the facility. This claim is not alleged in the complaint, *see* Complaint ¶¶ 54-56, and was raised for the first time in response to the motion for summary judgment. Although the court does not need to resolve this issue to decide this motion, there is a substantial question whether this claim is properly before the court. Not only was this a theory raised for the first time in response to Sandy River's motion for summary judgment, but it is also difficult to find a basis for this claim in the consulting agreement (Exhibit E to Complaint) which, *inter alia*, contains an integration clause (§ 8.1) and outlines the various services to be provided in connection with the operation of the facility. Although there is some language in the agreement relating to general advisory and consulting services, a fair reading of the agreement suggests that the consulting services to be provided by Sandy River were intended to relate to the operation of the facility, not whether it should be closed or remain open.

Finally, since the consulting agreement was between Sandy River and Jed Prouty Healthcare Management Co. and expressly disclaims the existence of any third party beneficiaries, Sandy River will be granted summary judgment on Count V as against all plaintiffs other than Jed Prouty Healthcare Management Inc.

The entry shall be:

Plaintiffs' Rule 56(f) motions to stay are denied. Defendant Suburban Mortgage Associates Inc.'s motion for summary judgment is granted and the complaint is dismissed as against Suburban Mortgage Associates. Defendant Sandy River Healthcare System LLC's motion for summary judgment is granted as to Counts II and IV and those counts of the complaint are dismissed against defendant Sandy River Healthcare System LLC. Defendant Sandy River Healthcare System LLC's motion for summary judgment as to Count V is granted as to plaintiffs Lawrence Green, Jed Prouty

16

Investment Co. Inc., and Jed Prouty Health Care Inc., but denied as to plaintiff Jed Prouty Healthcare Management Inc.

The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

DATED:     November _7_, 2007

Thomas D. Warren
Justice, Superior Court

LEE BALS ESQ
100 MIDDLE STREET EAST TOWER
PORTLAND ME 04101-4102

*Plaintiff*

and County
Box 287
ne 04112-0287

JARED DESROSIERS ESQ
ONE MONUMENT SQUARE
PORTLAND ME 04101

*Suburban Mortgage Assoc*

COURTS
d County
x 287
e 04112-0287

JERROL CROUTER ESQ
PO BOX 9781
PORTLAND ME 04104-5081

*Sandy River Health Systems*